**Opinion issued June 29, 2023**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-22-00471-CR

———————————

**JAMES DERON SMITH, SR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 56th District Court
Galveston County, Texas
Trial Court Case No. 19-CR-1367

## MEMORANDUM OPINION

A jury found Appellant James Deron Smith, Sr. guilty of Aggravated Assault Causing Serious Bodily Injury, a second-degree felony, and sentenced him to fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.

In his sole issue, Appellant argues "the trial court committed jury charge error by filing a jury charge in this cause that contained handwritten markings on it, specifically: certain sentences were underlined, and certain phrases were circled and there was a handwritten bracket placed in the margin." Appellant argues he was harmed as a result of the jury charge error because his contention that he was acting in self-defense "was diminished by the[] markings on the charge."

We affirm.

## Background

Appellant James Deron Smith, Sr. ("Smith") and the complainant, Maurice Williams ("Williams"), were inmates in the Galveston County Jail. Smith and Williams were in the same jail pod, awaiting disposition of their respective criminal charges. Their bunks were side by side, and they played cards most days.

On October 20, 2018, Smith was playing poker with Williams and several other inmates.[1] At around midnight, Williams accused Smith of cheating. Williams and Smith exchanged words at the game table. Williams proceeded to his bunk. Smith remained at the table for a short period and then returned to his bunk. At that point, a fight ensued. Smith's and Williams' versions of events differ as to who started the fight and whether Smith struck Williams in self-

---

[1] The poker game began on October 19, 2018 but the fight occurred early on October 20, 2018.

defense. Williams sustained significant injuries, including the loss of sight in one eye and a broken nose.

Smith was charged with Aggravated Assault Causing Serious Bodily Injury. He pleaded not guilty.

## A. The Trial

The following witnesses testified for the State at trial: Lieutenant Scott Finlaw, Detective Smitty Hill, Lieutenant Shawn Lozica, Williams, and Deputy Eusebio Alvarez.

## B. Lieutenant Finlaw[2]

Lieutenant Scott Finlaw with the Galveston County Sheriff's Office ("Lieutenant Finlaw") testified that he supervises forty to forty-eight staff members at the Galveston County Jail. Those staff members collectively supervise up to 1,150 inmates. The inmates are housed in "pods." Each pod has bunks, bathrooms, and showers.

On October 20, 2018, Smith and Williams were assigned to the same pod. Lieutenant Finlaw was working as a jail supervisor that night when he responded to a report of an "inmate fight" in Smith's and Williams' pod. He arrived at the pod to find Williams and Smith "in an altercation." Williams appeared to have "significant" injuries and was taken to the jail's medical facility. Smith arrived at

---

[2] Lieutenant Finlaw was a Sergeant at the time of the fight.

the medical facility soon after. He had some injuries on his hand. Lieutenant Finlaw testified that during his twelve years at the jail, he has responded to "hundreds" of inmate fights, and Williams' injuries were the most severe he has seen.

Lieutenant Finlaw testified that another deputy at the jail handed him a bloody eyeglass lens found near the bunk area in Smith's and Williams' pod after the fight. Lieutenant Finlaw gave the lens to another deputy who was going to the hospital with Williams because Lieutenant Finlaw "wanted to show them if the injury had come from that." The deputy transported the lens to the hospital and then returned it to Lieutenant Finlaw, who kept the lens for approximately a month and then discarded it. On cross-examination, Lieutenant Finlaw agreed the lens should have been preserved and photographed at the scene. He testified that no cameras had captured the fight, and he did not write a report after the fight.

Lieutenant Finlaw interviewed Smith, who told him Williams started the fight. Lieutenant Finlaw believes Smith may have said his glasses were knocked off during the fight. Lieutenant Finlaw did not interview Williams. He treated the episode as an "inmate fight." He testified that charges were not filed immediately after the fight because he had to go through the administration.

Lieutenant Finlaw testified that gambling is prohibited in the jail. If inmates get caught fighting, they go to lockdown or a segregation cell.

4

## C. Detective Hill

Detective Smitty Hill ("Detective Hill") with the Galveston County Sheriff's Office testified that he was brought into the investigation in February 2019, about four months after the fight. He was brought in to help with paperwork to facilitate the filing of charges. Detective Hill determined that before filing charges, additional investigation was required, including interviews of the victim, witnesses, and the offender.

Detective Hill interviewed jail supervisors and obtained their reports to ascertain what happened. He tried to interview three witnesses who were in the jail pod that night, but two had been released and the third declined to participate. Detective Hill and his supervisor, Lieutenant Shawn Lozica ("Lieutenant Lozica"), also interviewed several jail deputies who were on duty the night of the fight. After gathering medical records, interviewing Williams, and attempting to interview Smith, Detective Hill and Lieutenant Lozica believed they had probable cause to file a warrant. Based on the statement from Deputy Eusebia Alvarez ("Deputy Alvarez"), who witnessed the fight, Detective Hill determined Smith assaulted Williams.

Detective Hill testified the investigation should have been handled by a detective, not in-house by the jail, because it was a "major crime," which is how the Sheriff's Office classifies an aggravated assault. He felt little to no

5

investigation had been conducted when charges originally "were being filed," and he felt it was better to have "as complete of an investigation as possible . . . before filing charges." Detective Hill recalled that someone tried to get the videotape of the fight, but it was no longer in existence because several months had passed between the day of the incident and his involvement.

Detective Hill testified that there was no information reflecting Williams had started the fight. His investigation indicated instead that Smith had been the aggressor. Detective Hill testified that Smith's eyeglasses were damaged and that the glasses had been slapped off his face. The glasses were recovered in a puddle of blood in the pod. Detective Hill believed the glasses were used as a weapon, but he acknowledged that this was speculation on his part.

## D.    Lieutenant Lozica

Lieutenant Lozica works in the Galveston County Sheriff's Organized Crime Task Force, where he supervises thirty-eight detectives in various units. The Task Force investigates narcotics, violent crimes, gang members, and assists with other investigations as necessary. Lieutenant Lozica became involved with the investigation of the fight when Detective Hill called and advised him that another lieutenant wanted to file a warrant for aggravated assault for an incident at the jail. Detective Hill needed help filing the warrant and Lieutenant Lozica told him they needed to gather more information first. The jail had already called the district

6

attorney and charges had been approved. Lieutenant Lozica sat in on some interviews and interviewed Lieutenant Finlaw. He also oversaw Detective Hill's portion of the investigation.

Lieutenant Lozica testified Lieutenant Finlaw made some mistakes in the investigation, including collecting and throwing away the recovered eyeglass lens and not downloading the video of the pod captured during the fight. Lieutenant Lozica's and Detective Hill's investigation was conducted four months after Lieutenant Finlaw's investigation, and they did not have all of the information that Lieutenant Finlaw had at his disposal. Notwithstanding, Lieutenant Lozica agreed with Lieutenant Finlaw's conclusion that charges should be filed.

During their investigation, Lieutenant Lozica and Detective Hill learned that on the night of the fight, there was a poker game and an argument ensued over who won. A fight then broke out in the bunk area in Williams' and Smith's jail pod. Lieutenant Lozica's written report states that Lieutenant Finlaw advised that Williams slapped the glasses off of Smith's face. Lieutenant Lozica testified that it was possible Smith was slapped in the face and his glasses were hit, removed, or knocked off his face. Lieutenant Finlaw told Lieutenant Lozica that the video of the pod from that night had not captured the fight. Lieutenant Finlaw did not indicate who started the fight.

After concluding his investigation, Lieutenant Lozica came to the same

conclusion—that charges against Smith should be filed—but he conceded his investigation lacked the videotape, the eyeglass lens, and access to the inmates.

## E.  Maurice Williams

Williams testified that he was in the Galveston County Jail for fourteen months.  He passed the time by playing chess, poker, and cards.  The deputies did not stop them from playing poker even though it was against the rules.  At least twenty of the pod members would join in a poker game at various times.  They used food from the commissary as currency, usually playing winner-take-all.

Williams and Smith had a lot of interaction once Smith was transferred into Williams' pod.  Their bunks were side by side.  They never had issues before the incident on October 20, 2018.  They played cards nearly every day.

The night of the poker game, five inmates were playing.  They began to play at around 7 p.m. and continued to play until about midnight in the dayroom, and Williams had "basically almost won everything."  When the game ended, there were still four players left.  Williams testified that Smith began to cheat.  He testified he and Smith had a disagreement as to whether Smith "burned his hand."

Williams grabbed the sack of commissary food from the table, and they all dispersed.  Williams testified he was not angry when the game ended, given that he had just won.  Williams said he used a normal voice, was not yelling, but was firm when talking to Smith.  Williams returned to his bunk to make a snack before bed.

8

As he turned from his bunk, Smith was "just stabbing me all in the face and head and everything."

Williams testified he did not strike Smith. He said he was struck or stabbed six times and that he had to have stitches in his nose, which was broken, and across his eyebrow and his forehead. His eye was swollen from the attack so it could not be stitched up. Before Williams lost consciousness, he saw Smith holding a piece of something shiny, like glass, which he used to stab Williams. Williams had three medical procedures after the fight: a surgery to stabilize him and search for internal bleeding, a surgery to remove cartilage beneath his eye to reduce the swelling on his brain and eye, and a procedure to remove his stitches. Williams is now permanently blind in his right eye, which will need cosmetic surgery. He testified that the injuries will have a lifetime effect because he is a carpenter and he lost his peripheral vision and his ability to see things clearly and accurately. Williams also has permanent disfigurement of his nose and eye from the assault.

Williams testified that he was convicted of delivery of cocaine and delivery of marijuana in Arkansas. He was sentenced to three years in prison in Galveston County Jail for unlawful possession of a firearm by a felon.

## F.  Deputy Alvarez

Deputy Eusebio Alvarez ("Deputy Alvarez") from the Galveston County Sheriff's Office was working as a deputy in Smith's and Williams' pod when the

fight occurred. As a pod deputy, he stayed in an enclosed room with forty-eight inmates, watching over them and making sure "they're not doing anything they're not supposed to be doing." Deputy Alvarez's desk was on a wall in the middle of the room, where he could see most everything happening in the pod. He had been a pod deputy for a little over a month in October 2018. He did not really care about the inmates gambling if it was not causing any issues, but he did not know they were gambling that particular night.

Prior to the episode involving Smith and Williams, Deputy Alvarez had not been involved in a violent incident. It had been a normal day in the pod with no disturbances or arguments. The fight occurred after midnight. Deputy Alvarez testified that because it was a weekend, the inmates had a late "rack," or time to go to their bunks and turn the lights out. Normally, during the weekdays, the "rack" or "time to go to sleep" is at midnight, but on weekends "you have late rack so you have to extend it an hour until 1:00 a.m."

A verbal altercation occurred after midnight at the table where the inmates were playing cards. Deputy Alvarez saw Williams get up from the card table and tell Smith that he "burned his hand, which meant that he lost the game." Williams became upset, got up and leaned over Smith at the table and yelled at him. Williams was visibly angry and loud. Everyone in the pod heard it. Williams twice told Smith that he "burned his hand" and needed "to pay him his money."

10

Smith did not comply and Williams grabbed the bag of commissary food under the table and walked away to his bunk area. Deputy Alvarez testified that Williams disrespected or was "punking" Smith by saying the things he said in front of everyone. According to Deputy Alvarez, Smith calmly got up from the table and walked back to the same bunk area. Smith did not say anything.

Soon after, Deputy Alvarez saw Smith throw a punch and the fight started. Deputy Alvarez stood up, called "inmate fight" over the radio and quickly walked to the bunk area. He ordered other inmates to disperse, at which time he saw Williams on his knees grabbing on to Smith as Smith was striking him in the "face with one hand, upper cut." Deputy Alvarez never saw Williams hit, slap, punch, or assault Smith in any way. He saw Smith strike Williams at least five times. During the assault, Smith told Williams, "I don't play that shit."

Deputy Alvarez yelled at Smith multiple times to stop. He waited for another deputy to arrive before breaking up the fight, as required by jail policy. Another deputy arrived within thirty seconds. That deputy escorted Smith out and Deputy Alvarez dealt with Williams. Deputy Alvarez saw a lot of blood during the assault. He also saw an eyeglass lens on the ground. The nurse arrived with a wheelchair and tended to Williams' wounds. He had a "cut on the bridge of his nose" and another cut "maybe on his eyebrow or right about it, somewhere around . . . his eye."

11

Deputy Alvarez did not mention in his report whether Smith's eyeglasses were involved in the fight. Smith was wearing his glasses in the dayroom but not in the medical facility after the fight. Deputy Alvarez does not know whether Smith was wearing glasses when the fight broke out. He does not know whether Smith used a weapon during the right.

## G.   Conviction and Punishment

The jury convicted Smith. During the punishment phase of trial, Smith pleaded "true" to one enhancement for the felony offense of possession of a controlled substance, penalty group 1, with the amount more than 1 gram but less than four grams. Testimony during the punishment phase indicated Smith was previously convicted of criminal trespass of a habitation or infrastructure, possession of a controlled substance, five counts of assault causing bodily injury, possession or delivery of drug paraphernalia, terroristic threat of a family or household member, violation of a protective order, possession of cocaine, five counts of assault causing bodily injury–family violence, possession of methamphetamine, and deadly conduct.

The jury sentenced Smith to fifteen years' confinement in the Institutional Division of the Texas Department of Criminal Justice.[3]

---

[3]   Smith did not testify during either phase of trial.

**Discussion**

## A. Standard of Review and Applicable Law

We review potential jury charge error using a two-step inquiry. *Ngo v. State*, 175 S.W.3d 738, 744 (Tex. Crim. App. 2005); *Yepez v. State*, No. 01-22-00049-CR, 2022 WL 18163472, at *3, ___ S.W.3d ___, ___ (Tex. App.—Houston [1st Dist.] Jan. 10, 2022, no pet.) (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)); *Vernon v. State*, 571 S.W.3d 814, 826 (Tex. App.—Houston [1st Dist.] 2018, pet ref'd). We first decide whether error exists in the charge. *Ngo*, 175 S.W.3d at 744. If we determine an error exists, we next determine whether sufficient harm resulted from the error requiring reversal. *Id.* The degree of harm necessary for reversal depends on whether the defendant properly objected to the error at trial. *See Kirsch*, 357 S.W.3d at 649 ("The issue of error preservation is not relevant until harm is assessed because the degree of harm required for reversal depends on whether the error was preserved.") (citing *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). If the defendant properly objected to the charge, we consider whether "some" harm occurred from the charge error. *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985)).

"Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). Neither party bears the burden to show harm or lack thereof. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Reeves*, 420 S.W.3d at 816. Rather, the appellate court must examine the relevant portions of the entire record to determine whether an appellant suffered actual harm, as opposed to theoretical harm, based on the charge error. *Marshall*, 479 S.W.3d at 843.

When assessing whether an appellant suffered egregious harm based on a charge error, courts consider (1) the entire jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the argument of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Vasquez v. State*, 389 S.W.3d 361, 368–69 (Tex. Crim. App. 2012) (citing *Almanza*, 686 S.W.2d at 171). For actual harm to be established, the charge error must have affected "the very basis of the case, deprive[d] the defendant of a valuable right, vitally affect[ed] the defensive theory, or ma[de] a case for conviction clearly and significantly more persuasive." *Taylor v. State*, 332 S.W.3d 483, 490 (Tex. Crim. App. 2011); *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011) (quoting *Almanza*, 686 S.W.2d at 171); *see also*

14

TEX. CODE CRIM. PROC. art. 36.19 (stating trial court's judgment should not be reversed unless record shows that jury charge error was calculated to injure defendant's rights, or unless record demonstrates defendant did not have fair and impartial trial).

It is the trial court's responsibility to give the jury "a written charge distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. art. 36.14; *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017). The purpose of the charge is to inform the jury of the applicable law and to guide them in how to apply the law to the facts of the case. *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007). A proper jury charge consists of an abstract statement of the law and the application paragraphs. *Alcoser v. State*, 596 S.W.3d 320, 332 (Tex. App.—Amarillo 2019) (stating that "a jury charge should begin with an abstract paragraph defining the elements of an offense, or defining significant words or phrases, followed by an application paragraph that applies that law to the facts of the particular case"), *rev'd and remanded on other grounds*, 663 S.W.3d 160 (Tex. Crim. App. 2022). The abstract paragraphs serve as a glossary to help the jury understand concepts and terms used in the application paragraphs of the charge. *Alcoser*, 596 S.W.3d at 328. The application paragraphs then apply the "pertinent penal law, abstract definitions, and general legal principles to the particular facts and the indictment allegations." *Vasquez*, 389 S.W.3d at 366.

15

**B.    Analysis**

In his sole issue, Smith argues that the jury charge contained an error.  Smith does not claim there were any misstatements of law in the jury charge.  Indeed, he does not object to the abstract portion of the charge, to any definitions, to the application paragraphs, or to any instructions.  Rather, his sole complaint is that the jury charge contained "handwritten markings" by the trial court which amounted to a comment on the weight of the evidence and resulted in egregious harm to Smith.

Smith argues he was unable to object to the handwritten markings on the jury charge because he did not know about them during trial.  As such, he argues the "some harm" standard of review should apply under *Almanza.*  For the reasons stated below, we need not determine which harm standard applies because we find there is no evidence of jury charge error in this case.

**1.    The Charge Conference and the Jury Charge**

On May 25, 2022, the trial court conducted the charge conference.  The trial judge acknowledged receiving "a proposed charge of the court from the state" but indicated he felt there was "a little bit missing like the spoliation charge" and he did not like the way the charge was set out.  The trial court proposed a different charge and provided counsel with a copy of the proposed charge.[4]  The State objected that the application paragraph improperly appeared before "the general

---

[4]    Smith had previously been tried in 2021, and the trial resulted in a hung jury.  The trial court proposed using the charge from the first trial.

16

instructions," that it contained an "apparent danger instruction" which was not proper, that the State was not sure if defense counsel was requesting a "deadly force" or "regular force" self-defense instruction; and that there was no evidence of bad faith justifying the inclusion of a spoliation instruction concerning the "destruction or loss of evidence." Defense counsel responded that Smith agreed with the charge, that it agreed to a "regular" self-defense instruction, and that there was ample evidence of bad faith to support a spoliation instruction.

The trial court overruled the State's objections and inquired whether there were any "objections from the defendant" to which defense counsel responded, "No, sir." The trial court then indicated, "Okay, this is the charge you'll get."

The trial court brought the jury back into the courtroom and read the charge aloud to the jury. No one objected to the reading of the charge to the jury. Closing arguments followed. At the conclusion of closing arguments, the trial court told the jury, "I'm going to send you back to the jury deliberation room. It might take us a couple of minutes to get the exhibits together. As soon as we do, we'll send those back. You'll go back with the charge." The jury then retired for deliberations. It is unclear from the record when the charge was sent to the jury or what copy of the charge was given to the jury.

The record indicates that the charge filed in the clerk's record was filed stamped at 8:22 am on May 25, 2022, the morning of closing arguments. The

portion of the filed charge relevant to this appeal appears on page 4, containing an instruction on the use of deadly force. Page 4 of the filed jury charge appears as follows:

When a person is attacked with unlawful deadly force, or he reasonably believes he is under attack or attempted attack with unlawful deadly force, and there is created in the mind of such person a reasonable expectation or fear of death or serious bodily injury to himself at the hands of such attacker, then the law excuses or justifies such person in resorting to deadly force by any means at his command to the degree that he reasonably believes immediately necessary, viewed from his standpoint at the time, to protect himself from such attack or attempted attack. It is not necessary that there be an actual attack or attempted attack, as a person has a right to defend his life from apparent danger as fully and to the same extent as he would had the danger been real, provided that he acted upon a reasonable apprehension of danger, as it appeared to him from his standpoint at the time, and that he reasonably believed such deadly force was immediately necessary to protect himself against the attacker's use or attempted use of unlawful deadly force.

In determining the existence of real or apparent danger, you are instructed to consider all the facts and circumstances in evidence before you; all relevant facts and circumstances surrounding the use of force or deadly force, if any; the previous relationship existing between the Defendant and the alleged injured party; together with all relevant facts and circumstances going to show the condition of the mind of the Defendant at the time of the alleged offense, including any and all threats previously communicated to the Defendant or the third person from the alleged injured party or the other person or persons with the alleged injured party. In considering such circumstances, you should place yourselves in the Defendant's position at that time and view them from his standpoint alone.

18

## 2. Discussion

Smith's argument is premised entirely on the unattributed handwritten marks on a single page of the jury charge. He assumes, without pointing to any evidence in the record, that the trial judge made the handwritten notations on the charge and, in doing so, alluded "to a particular fact in evidence" and made a remark "calculated to convey to the jury his opinion of the case." Smith posits that the markings allegedly made by the trial judge constitute a "judicial comment on the weight of evidence and diminished appellant's defensive theory that he was acting in self-defense."[5]

There is no evidence in the record that establishes who made the markings on the jury charge, when they were made, or what effect, if any, they had on the jury. There is also no evidence in the record that the marked jury charge was ever presented to the jury. While the trial court read the jury charge to the jury and told the jury he would provide them with a copy of the charge, there is no indication in

---

[5] Smith cites *Beltran de la Torre v. State*, 583 SW.3d 613 (Tex. Crim. App. 2019) and *Brown v. State*, 122 S.W.3d 794 (Tex. Crim. App. 2003) to support his argument the markings on the charge were a comment on the evidence. But the cases are inapposite. Neither case involved handwritten notations on a jury charge. *See Beltran de la Torre*, 583 SW.3d at 619–20 (holding jury instruction that was unnecessary and drew jury's attention to evidence that would support State's argument was improper comment on weight of evidence); *Brown*, 122 S.W.3d at 802 (holding trial court erred in giving instruction that focused jury's attention on type of evidence that could support finding of criminal intent). Moreover, unlike the appellants in *Beltran de la Torre* and *Brown*, Smith does not complain about the instructions given to the jury.

19

the record that the marked jury charge was the charge provided to the jury or that the jury ever saw the markings on the charge. Indeed, Smith admits that his argument is based on nothing more than speculation. He states that "although the record is not clear, one would *assume* that the wrong jury charge was mistakenly filed with the Clerk's Office in his cause and then copies made and given to the jury for deliberations." (Emphasis added.) He offers no evidence and no citation to the record to support this *assumption.*

Smith relies on *Hoang v. State*, 997 S.W.2d 678 (Tex. App.—Texarkana 1999, no pet.) and *Watts v. State*, 99 S.W.3d 604 (Tex. Crim. App. 2003) in asserting that "[m]arking up the jury charge in the way that occurred in this case was a judicial comment on the weight of evidence and diminished appellant's defensive theory that he was acting in self-defense." But neither case involved handwritten notations on an otherwise-unobjectionable jury charge. In *Hoang*, the court of appeals held that the appellant waived error as to his complaint concerning a comment the trial court made in front of the jury and, in any event, the judge's statement did not convey his opinion on the evidence, imply approval of the State's argument, indicate disbelief in the defendant's position, or diminish the credibility of the defendant's case. 997 S.W.2d at 680, 684. In *Watts*, the trial court directly addressed the jury right before the parties rested and before the charge was read, taking judicial notice of a Texas Court of Criminal Appeals case regarding the

20

"specific application of law to facts" in an unrelated case on a similar topic. 99 S.W.3d at 607. The Court of Criminal Appeals held the trial court "committed error by commenting on the weight of the evidence." *Id.* at 613. These cases have no bearing on the issue in the present case concerning handwritten marks on a jury charge that no one knows who made, when they were made, or if they were even presented to the jury.

In *Chapman v. State*, 859 S.W.2d 509 (Tex. App.—Houston [1st Dist.] 1993), *rev'd on other grounds*, 921 S.W.2d 694 (Tex. Crim. App. 1996), we held that speculation as to the origin of handwritten notations on a jury charge is not proper and cannot support a finding of charge error. We disregarded the appellant's argument that modifications made to the jury charge created reversible error. 859 S.W.2d at 514. The appellant argued that because a date on the charge was changed, and several lines regarding "assessment of punishment" were underlined, he was deprived of a fair trial. *Id.* We held, "The record contains no indication as to who underscored the lines. We will not accept as fact appellant's assertions in his appellate brief, which the State disputes as speculative, and which are not supported by the record." *Id.* (citation omitted).[6]

---

[6] We also noted that the argument was not preserved for appellate review. *Chapman v. State*, 859 S.W.2d 509, 514–15 (Tex. App.—Houston [1st Dist.] 1993), *rev'd on other grounds*, 921 S.W.2d 694 (Tex. Crim. App. 1996)

21

Similarly, in *Buckley v. State*, No. 14-12-00202-CR, 2013 WL 865567 (Tex. App.—Houston [14th Dist.] March 7, 2013, pet. ref'd) (mem. op., not designated for publication), the appellant complained that underlining in the jury charge indicated "there may have been a disagreement among jurors on whether [the decedent] was intentionally killed or merely threatened with a deadly weapon." Our sister court responded, "Nothing in the record explains why the notations were made, who made them, or what they signify. Even assuming that these notes were made by the jury, this court has previously refused to engage in the 'pure speculation' of interpreting juror underlining. . . . We see no reason here to depart from this approach[.]" *Id.* at *2 (citing *Bolden v. State*, No. 14–96–00319–CR, 1998 WL 255170, at *5 (Tex. App.—Houston [1st Dist.] May 21, 1998, pet. ref'd) (not designated for publication)); *see also Bolden*, 1998 WL 255170, at *5 ("While appellant makes much of jurors' notes underlining and highlighting the conspiracy portion of the charge, it is pure speculation as to whether the jury indeed employed this theory in reaching its verdict."); *Wilcut v. State*, No. 04-14-00737-CR, 2015 WL 2124531, at *4 (Tex. App.—San Antonio May 6, 2015, no pet.) (mem. op., not designated for publication) ("Although [appellant] notes the words 'constitutes attempted or consummated theft of or criminal mischief to the tangible' were underlined in the jury charge by a pen or pencil, any theory or conclusion about the reason or by whom those words were underlined would be pure speculation.").

22

Smith has not established the trial court wrote on the charge or committed jury charge error in any manner. Nor has he cited any authority that suggests extraneous handwritten markings on a jury charge from an undetermined source may constitute charge error. Finally, Smith does not identify any purported charge error other than the handwritten notations. Given that his argument is based entirely on speculation, we hold Smith did not establish jury charge error. We overrule Smith's sole issue.[7]

## Conclusion

We affirm the trial court's judgment.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Goodman, Landau, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).

---

[7] Given our disposition, we need not engage in a harm analysis.

23